177 Cal.App.4th 24 (2009)
In re MELISSA R., a Person Coming Under the Juvenile Court Law.
ALAMEDA COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent,
v.
S.V., Defendant and Appellant.
No. A121951.
Court of Appeals of California, First District, Division Three.
August 27, 2009.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*26 Judith E. Ganz, under appointment by the Court of Appeal, for Defendant and Appellant.
Richard E. Winnie, County Counsel, and Grace Fongmei Tam, Deputy County Counsel, for Plaintiff and Respondent.
Linda J. Conrad, under appointment by the Court of Appeal, for Minor.

OPINION
SIGGINS, J.
Melissa R. is a 20-year-old woman with severe developmental disabilities. She needs assistance in all of her activities of daily living, and will need it for the rest of her life. This appeal concerns the juvenile court's decision to terminate dependency jurisdiction and leave Melissa's placement in her group home. S.V. (Mother) contends the court erred when it dismissed dependency jurisdiction; that the evidence does not show a risk of detriment to Melissa if she were returned to Mother's care; and that lack of compliance with the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA, or the Act) requires reversal. We conclude the court properly dismissed dependency jurisdiction and allowed Melissa to remain in her group home, and that Mother's challenge to the risk of detriment finding is moot. We also conclude that reversal and remand to require the juvenile court to comply with ICWA would be futile because Melissa has reached the age of majority and, therefore, is not an "Indian child" within the meaning of the Act. We therefore affirm the juvenile court orders.

BACKGROUND

Prior Dependencies
Melissa was born in June 1989 with a congenital chromosomal anomaly that has severely retarded her development.[1] Her medical problems include cerebral palsy, limited mobility, mental retardation and a cleft palate.
Mother's inability to care for her daughter first resulted in intervention by the Alameda County Social Services Agency (the Agency) in October 1989. After a period of time in the care of her maternal grandmother, the trial court *27 returned Melissa to Mother's custody and retained jurisdiction. The dependency case was dismissed in November 1990. Although Melissa was developmentally delayed and had not yet begun to walk, she appeared to be healthy and thriving.
The second dependency case was initiated in January 1995, after police found cocaine and drug paraphernalia in Mother's home. The home was filthy and her children were undernourished and suffering from neglect. Both children were placed in a Regional Center of the East Bay (Regional Center) community care facility.
Mother suffers from an organic mental disorder and mild mental retardation, and has a lengthy history of substance abuse. Her initial compliance with drug treatment programs and drug testing was sporadic. But by December 1995, her case manager believed Mother was clean and sober.
After the children appeared to deteriorate while in Mother's care for overnight visits, it was recommended that she needed supervision and assistance in child rearing. In December 1996, the Agency recommended that the children be returned to Mother with extensive family maintenance services. Mother completed her reunification plan "in spirit as well as in form" and attended outpatient drug treatment and therapy even after it was no longer required. The dependency case was dismissed in May 1997, when the Agency reported that Mother's parenting skills were excellent and the risk to the children was substantially reduced.

The April 2006 Detention
The case before this court began when Melissa was 16 years old, and Mother was arrested for driving a stolen car. Police found Melissa and her brother in a trailer towed by the car Mother was driving. Melissa was nonverbal and unable to walk or stand for long periods of time.
The detention report recounted Melissa's long history of abuse and neglect. In November 2005, Melissa's maternal grandmother reported that Mother and the children had moved in with her and that Mother left the children with her for weeks at a time without providing money or food for their care. She said Melissa could neither walk, speak nor use the toilet by herself. Melissa's maternal aunt reported that she kicked Mother out of her home several months earlier because Mother was using drugs and her boyfriend was a drug dealer. The aunt said Mother did not take good care of the children.
Although Melissa's maternal grandmother had cared for Melissa for much of her life, she was too ill to do so when this case began. Melissa was placed *28 in a group home and when she arrived she appeared to have been grossly neglected. Melissa did not communicate at all. She slept during the day and was up all night. She cried for no reason and sat with her hands behind her back all day. The home staff was required to help with her activities of daily living, including bathing, toileting, dressing and eating. Although she was able to walk, she would not get up unless prompted and tired easily. She also would persistently bite her hands and wrists. Melissa seemed to lack stimulation at home. Her school attendance was sporadic, and she had not gone to school for almost a year before this dependency.
Family members reported that Mother had a substance abuse problem, but she denied that she used drugs. She said she was arrested because she bought a stolen car from a friend. She lived in maternal grandmother's trailer, and said she could not enroll Melissa in school because her name was not on grandmother's lease.
The juvenile court sustained jurisdiction under Welfare and Institutions Code[2] section 300, subdivisions (b) and (g), and ordered the Agency to provide Mother with reunification services.

October 2006Six-month Review
The six-month review report recommended that Melissa remain a dependent of the juvenile court. Mother enrolled in a transitional treatment program when she was released from jail in April 2006, but she left the program after several weeks without completing it. She had not cooperated with drug or alcohol testing and was homeless. During this period she falsely reported to Melissa's school, social workers and police that Melissa had been kidnapped. Mother cooperated in setting up regular visitation with Melissa, but her disruptive behavior limited those supervised visits.
Melissa showed significant improvement. She was doing well in her high school transitional program. Her self-mutilating behavior decreased and she was learning how to eat solid foods. The group home operator said there would be a high degree of risk to Melissa if she were to reunify with Mother.
Although Mother was given notice of the six-month review hearing, she did not appear. The court found that Mother had made partial progress toward alleviating the causes for Melissa's placement and ordered continued reunification services.

*29 March/April 200712-month Review

By March 2007, Mother had complied with her case plan to the best of her ability. She was enrolled in an outpatient treatment program, cooperating with drug testing, receiving one-on-one therapy, and attending parenting classes. But several of her drug test results were positive for cocaine and methamphetamine. Mother told her social worker she had located housing, but could not remember the address. She consistently visited with Melissa each month and cooperated with the social worker and group home staff. Visits appeared to be going well. Her supervising case manager said Mother was a "wonderful person," but that her "somewhat condescending behavior and ongoing unresolved mental health concerns and addiction continue to present concerns regarding [Mother's] ability to provide appropriate care to a child with special needs."
Melissa had improved physically and emotionally over the previous months. The Agency still believed that returning Melissa to Mother's care would place her at risk. The court found that Mother had made no progress, continued Melissa as a dependent child of the court, and extended reunification services for six more months.

September 200718-month Review
Melissa turned 18 in June 2007. In August 2007, the Agency sought a 60-day continuance of the 18-month review in order to arrange an appropriate transition plan for Melissa. Mother wanted Melissa returned to her custody. Mother was still enrolled in her outpatient treatment program and had worked closely with her counselor on the issues leading to Melissa's removal. She had obtained housing at the Paradise Trailer Court in San Leandro; attended substance abuse sessions, parenting classes and therapy; visited monthly with Melissa; and "made herself available to work with the Regional Center as it relates to services for her daughter." Mother's drug tests were negative, but the Agency had not yet received test results for June and July 2007.
Melissa still could not care for herself and needed help to eat, dress, bathe, use the toilet and perform other basic activities. She communicated through facial expressions, gestures, posture and behavior, and she was making some progress towards expressing her wishes and feelings, albeit without speaking. She was also making excellent progress toward eating without being prompted to chew or having her food cut up for her. She showed more interest in toys and objects. Her self-injurious behavior had decreased. Melissa was beginning to enjoy walks, visits to parks and restaurants, and other group activities. She usually seemed content in the group home *30 environment and was generally in a pleasant mood. Melissa was showing significant improvement at Liberty High School and adjusting well with her classmates.
The Regional Center and La Familia Counseling Service opposed Melissa's return to Mother. La Familia was concerned that Mother would have difficulty working with the supportive system it developed for Melissa. The staff at Melissa's group home felt that out-of-home placement remained the best option for her. The Agency also believed such placement was the best option because of Melissa's level of need, but that placement in Mother's home would be possible if Mother were to consistently use the services offered by the Regional Center. If she did not, however, the Agency was concerned that Mother would be overwhelmed by Melissa's special needs. The Agency recommended dismissal of the dependency because Melissa was 18 years old with a permanent living arrangement in her group home.
The parties submitted on the Agency's report. The court ordered a permanent plan for Melissa that continued her placement at the Avalon Group Home with the goal of her emancipation and identification of a long-term mentor. A contested hearing was set to address Melissa's placement before the dependency action was to be dismissed.

November 2007 and January 2008 Interim Review Reports
On November 15, 2007, the Agency filed a new report recommending that the court set aside the permanent plan for Melissa's out-of-home placement and instead order placement in Mother's home and dismiss the dependency. The Agency requested that La Familia Counseling Service provide services to Mother so that Melissa could be returned home, but it turned out that Mother was ineligible for such services because Melissa had reached adulthood and was living in a group home. Melissa's Regional Center case manager also felt that Mother was not ready to care for Melissa and that it was best for Melissa to remain where she was.
Since September 2007, Melissa had unsupervised weekend visits in Mother's home. Mother provided for Melissa's basic needs during the visits and they appeared happy together. Mother was in the process of completing a parenting evaluation and was still participating in her outpatient treatment program.
The court referred the parties to mediation. Mother was cooperative and attended. When the Agency filed its next interim report in January 2008, it again recommended that Melissa be returned to Mother. The social worker observed a home visit and reported that Mother's home was organized and *31 small but adequate. Mother and Melissa appeared to be comfortable and happy with each other. Melissa spent two weeks at Mother's home over her winter school break and there were no reports of problems. However, Mother's drug tests were problematic. In September 2007, Mother tested positive for benzodiazepines and gave a number of diluted tests. Between October 2006 and February 2007, she tested positive once for methamphetamine and several times for cocaine.
Melissa's attorney opposed the Agency's recommendation that she be returned to Mother and asked the court to dismiss the dependency. She argued that Mother had no legal right to custody because Melissa had reached majority, and Melissa's adult placement was determined by the Lanterman Developmental Disabilities Services Act. (§ 4500 et seq.; the Lanterman Act.) Counsel argued it would be detrimental to return Melissa to Mother's custody. Melissa was "thriving in an excellent group home for similarly situated young disabled adults. She is in an excellent school environment at Liberty Transition High School and she participates in many home and community-based leisure and recreational activities with her peers." She had made significant progress towards being social, feeding herself and playing with toys. She appeared to enjoy her visits with Mother, but it was not difficult for Melissa to separate from Mother when she returned to her group home. Melissa was equally comfortable in her group home setting, was more physically active and had substantially more resources for educational, recreational and social stimulation there. She developed significant relationships with other young adults and staff. It was possible Melissa could live her entire adult life at Avalon and still have visits with her family.

The May 8, 2008, Interim Report and the Contested Hearing
The contested hearing took place over nine days between February 28, 2008, and June 4, 2008. On May 8, 2008, the Agency again changed its recommendation to request that (1) Melissa remain at Avalon; (2) the dependency case be dismissed; and (3) services for Mother be terminated. The Agency had received Mother's psychological and caregiver competency evaluations and had numerous discussions with all parties about Melissa's ongoing care. Based on the evaluations, input from group home staff and other care providers, and her lengthy involvement with the case, Melissa's caseworker believed Melissa should remain at Avalon with continued visitation with Mother.
A number of witnesses testified at the contested hearing. Senior case manager Nancy Barreda and supervisor Marcia Campos from La Familia Counseling Service, and care provider Lira Reyes and behavior/program *32 consultant Kokil Stillwater from Avalon testified favorably about Melissa's care, environment and progress at the group home. Campos believed Mother was not capable of providing suitable care for Melissa, but felt her love, visitation, and support could be a positive factor in Melissa's life. She testified that, pursuant to the authority provided by the Lanterman Act, La Familia could provide for Melissa without the need for a conservatorship; that placement at Avalon would allow Melissa to achieve her fullest potential in the least restrictive environment; and that Mother's history of chemical dependency combined with her own special needs made it highly possible that Melissa would be harmed were she returned to Mother. Stillwater concurred in Campos's assessment.
Dr. Deepa Abraham evaluated Mother's competence as a caregiver. Dr. Abraham believed that Mother was unable to sustain the level of care Melissa required due to her own cognitive limitations and her failure to access social services. She thought Melissa should remain in her group home.
Caseworker Marilyn Warrick also recommended that Melissa stay at Avalon. Warrick reported that Melissa progressed in the group home program. She believed that Mother could not provide the high level of care Melissa required and was concerned about Mother's potential for relapse. Like Campos, Stillwater and Abraham, Warrick was concerned there would be a substantial risk of neglect and detriment if Melissa were returned to Mother's care. Warrick explained that she had previously recommended returning Melissa to Mother because Mother was complying with the case plan, but she changed her mind after she reviewed the competency evaluation prepared by Dr. Abraham.
Mother testified about her capabilities and preparation to care for Melissa. Jackie Silva, resident manager of Mother's trailer court, testified that Melissa was "really excited to see her mom" on a visit the previous summer because she made noises, reached out, and had "little tears in her eyes." Melissa generally seemed happy in Mother's presence. Silva was willing to help Mother with Melissa, but she had no children, had never worked professionally with children, and had never taken care of Melissa.
Mother's sister, R.G., lives near Stockton. She testified that she could help Mother care for Melissa, but she had seen Melissa only twice in the past six months and the many demands on her time prevented her from seeing Mother between April 2006 and December 2007. Her husband was then in remission from stage 4 lymphoma and she had a teenager at home and grandchildren with her every other week. R.G. believes Mother is the "best mom" because she is amazing and dedicated and has cared for her children by herself all of their lives.

*33 June 4, 2008, Order

The court found there was a substantial risk of detriment to Melissa if she were returned to Mother's care. The court rejected Mother's request that the dependency case proceed while she continued to work toward reunification, and found it unrealistic to expect that Mother would be able to care for Melissa anytime in the near future. The court explained that "it's really not a practice of mine to keep dependency cases open where the Agency has developed an adequate transitional plan for emancipation, and here the plan for Melissa is not only adequate but excellent. [¶] We all know that Melissa will never have a chance to truly live independently or go to college or do a lot of the things that other young adults do, but under the Lanterman Act she is entitled to care in the community in the least restrictive setting possible.. . . [¶] The Regional Center has done a wonderful job of finding such a setting for Melissa. She's in a wonderful home with excellent care, a full staff to meet all her needs around the clock, an excellent school program, friends her own age and many activities and outings. She can live there indefinitely. [¶] She will continue to visit her mother as she does now, as both Avalon and the Regional Center considers family contact to be extremely important. No mother is ever happy to let go of a child she loves, but I have absolutely no hesitation in saying that I believe dismissal of dependency with Melissa remaining at Avalon is by far the best solution for Melissa." Accordingly, the court dismissed the dependency case.
Mother filed this timely appeal.

DISCUSSION

I., II.[*]

III. ICWA Defects Are Also Moot

It is apparently undisputed that the Agency failed to comply with ICWA's notice requirements despite having information that Melissa might be of Indian heritage. This error, however, is also moot.
(1) If there is reason to believe that a child who is the subject of a dependency proceeding is an Indian child, ICWA requires that notice of the proceeding be given to the implicated tribes or the Secretary of the Interior. (In re Desiree F. (2000) 83 Cal.App.4th 460, 471 [99 Cal.Rptr.2d 688]; *34 25 U.S.C. § 1912(a); Cal. Rules of Court, rule 5.481(a)(4).) "The Indian status of the child need not be certain to invoke the notice requirement." (Desiree F., supra, at p. 471.) Although Mother informed the Agency in 2006 that she had Cherokee ancestry in her maternal family, the Agency's status review reports uniformly, and without explanation, reported that ICWA did not apply in this case. Apparently no ICWA notice was given.
(2) Mother contends the omission requires reversal of the juvenile court orders with instructions to the court to retain its jurisdiction over Melissa and order the Agency to comply with ICWA. Because of the unusual posture of this case, we do not agree. ICWA's requirements are stringent, and noncompliance by courts and child welfare agencies lead to frequent reversals that direct compliance with ICWA requirements. (See generally In re I.G. (2005) 133 Cal.App.4th 1246, 1254 [35 Cal.Rptr.3d 427].) But reversal to direct ICWA compliance is not an option in this case. ICWA applies only when an "Indian child" is the subject of a "child custody proceeding," as those terms are defined by the Act. (25 U.S.C. §§ 1903, 1911; see Matter of Adoption of Baade (S.D. 1990) 462 N.W.2d 485, 490.) An "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe . . . and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see Welf. & Inst. Code, § 224.1, subd. (a).) California employs the same definitionsnot some "higher protection" that would broaden the scope of these definitions to include individuals beyond the age of majority, as Mother contends. (§§ 224, subd. (b), 224.1, subds. (a), (c).)
(3) As Melissa is now 20 years old, she can no longer be an "Indian child" who could be subject to ICWA proceedings if the orders Mother challenges in this appeal were reversed. Although ICWA gives adopted Indian children over the age of 18 the right to certain information concerning their parentage and tribal affiliation (25 U.S.C. §§ 1917, 1951), those provisions apply only to individuals who, unlike Melissa, were in an adoptive placement.[5] There is therefore no basis for the institution of ICWA proceedings in this case. Because a reversal to require the Agency to comply with ICWA could not provide Melissa, Mother or any possible Indian tribe with meaningful relief, Mother's ICWA contentions are moot.

IV. Judicial Notice[*]

*35 DISPOSITION
The orders of the juvenile court are affirmed.
McGuiness, P. J., and Jenkins, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion, parts I., II., and IV.
[1] Melissa has an older brother, David, born in May of 1984, who also suffers from chromosomal anomalies and has extensive developmental and medical needs.
[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[*] See footnote, ante, page 24.
[5] This is also likely why information concerning a child's possible Indian heritage is required to be included in any report prepared pursuant to section 391.
[*] See footnote, ante, page 24.