Filed 8/17/21  In re N.N. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re N.N., a Person Coming Under the Juvenile Court Law. | |
| KINGS COUNTY HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>H.L.,<br><br>        Defendant and Appellant. | F081725<br><br>(Super. Ct. No. 19JD0241)<br><br>**OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Kings County.  Kathy Ciuffini, Judge.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Lee Burdick, County Counsel, and Rise A. Donlon, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

H.L. (mother) appeals from the juvenile court's jurisdiction and disposition orders declaring her then 17-year-old son, N.N., a dependent under Welfare and Institutions Code section 300, subdivision (g);[1] limiting her right to make educational decisions for N.N.; and finding that the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) does not apply.[2]

We conclude mother's appeal is moot and dismiss it.

**FACTUAL AND PROCEDURAL BACKGROUND**

**Referral**

In October 2019, N.N., then 16 years old and a junior in high school, lived with mother, A.L. (stepfather), and two younger half siblings, then ages seven and four years old.[3] The Kings County Human Services Agency (the agency) received a referral after the Lemoore Police Department responded to a call for service at the family's residence on October 14, 2019, concerning an altercation between mother and N.N. When police arrived, mother and N.N. were outside the house. Both reported they were arguing over a prior incident that occurred several days earlier and was recorded on a cell phone by stepfather. During the recorded argument, N.N. and mother had pushed each other and on the night police were called, mother wanted N.N. to watch that recording on her phone with her. She told N.N. his behavior was aggressive, he told her she was not justified in pushing him, and she stated she was justified because she was the parent.

N.N. reported that mother took his phone away from him after she heard him call one of his teachers and she kept trying to throw soda on him. N.N. told her to stop or he

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] Mother does not appeal the juvenile court's jurisdictional findings under subdivisions (a) and (b)(1) of section 300.

[3] N.N.'s half siblings are the children of mother and stepfather.

"would fuck her up." Stepfather intervened and told N.N. to go to the backyard to fight, which N.N. interpreted to mean stepfather was going to fight him. Stepfather then called the police and advised mother to press charges. Stepfather told police he saw N.N. and mother hit each other.

N.N. reported that mother took multiple swings at him and he bear-hugged her. N.N. had a one-inch gash under his eye, a small scratch and slight swelling to his nose, a small scratch on his chin, and multiple scratches on one arm. Mother was arrested for child endangerment and N.N. left the residence with Y.N. (paternal grandmother).

**Section 300 Petition and First Amended Petition**

On December 4, 2019, the agency filed a juvenile dependency petition alleging N.N. came within the juvenile court's jurisdiction under section 300, subdivision (a) (serious physical harm), and that he may have Indian ancestry.

On December 6, 2019, the agency filed a first amended petition adding a jurisdictional allegation against mother under section 300, subdivision (b)(1) (failure to protect).

**Detention Hearing**

On December 9, 2019, the juvenile court found a prima facie showing had been made that N.N. was a person described by section 300, found that ICWA may apply, ordered N.N. detained from mother, and directed the agency to provide for supervised visitation between mother and N.N. and to provide appropriate reunification services to mother. At that time, mother was unwilling to have N.N. return home and N.N. was unwilling to return home.

A combined jurisdiction and disposition hearing was set for January 13, 2020.

**Jurisdiction and Disposition Report**

The jurisdiction and disposition report prepared by the agency recommended that the juvenile court sustain the petition allegations, adjudge N.N. a dependent of the court, and provide mother with supervised visitation and reunification services. The agency

further recommended that if A.N. (father) elevated his paternity, he be denied reunification services pursuant to section 361.5, subdivision (b)(16).

The report documented no prior dependency history, but seven prior referrals that were deemed either unfounded or inconclusive. Mother had one prior vandalism charge, which was dismissed, and a pending child cruelty charge that led to the present dependency proceeding. Father had a lengthy criminal history, was required to register as a sex offender, and was in custody at the time of the report.

N.N. was interviewed at paternal grandmother's apartment after the agency received the referral. N.N. reported to a social worker that his and mother's argument that night involved a cell phone video of an argument between them several days earlier. The prior argument was recorded by stepfather and began after N.N.'s teacher emailed mother regarding his math grade. Mother accused N.N. of doing poorly on purpose and she yelled at him, "[got] in his face," and pushed him. After mother pushed N.N. several more times, he pushed her back. Mother yelled at him and belittled him, telling him she is the parent, he was "'pissing [her] off,'" and he was her "'biggest regret.'"

On the night that stepfather called police, mother wanted N.N. to look at what he was doing in the cell phone video, and N.N. wanted them to watch the entire recording together if mother wanted to talk about it. Mother was yelling in his face and swinging at him before he "told her that he was going to 'fuck her up,'" and she threw her soda can at him approximately four times before he grabbed her.

N.N. reported that mother often yelled at him, told him he is her biggest regret, and accused him of doing drugs and of being a liar and a manipulator. Mother also accused N.N. of forging her signature, which he denied, and she had him take a drug test, which was negative. N.N. reported mother and stepfather used marijuana, and his younger half siblings had access to the backyard, where he found a jar of cannabis. However, N.N. did not believe his younger siblings were in any danger because they were stepfather's children and he treated them differently than he did N.N. N.N. reported

4.

he did not feel safe in the home with mother and stepfather, and he was okay staying with paternal grandmother.

The social worker and a police officer contacted mother and stepfather at their house. An additional officer was requested because stepfather had been "aggravated" earlier and there was concern he would be uncooperative.

Mother and stepfather would not let the social worker and officers into their home or speak with their other children, and they were "highly upset." Mother was distraught, raised her voice, and told the agency to take N.N. because she was done with him. She stated the agency and police were enabling him, he was manipulative, and he had outbursts when he did not get his way. Mother also stated she was going to see a doctor for a CT scan of her head, and she allowed the social worker to photograph her bruised, scratched hand.

Mother showed the social worker her text messages to N.N. that preceded the referral incident and a screenshot from the recorded argument that she had wanted to show to N.N. so he could see how "'scary'" he looked. Mother told the social worker N.N. used drugs, stole credit cards, and forged her signature. When asked how she knew N.N. was using drugs, mother stated he smoked nicotine and used vape pens. Mother stated that N.N. "beat her like a man," he held her and punched her with his fists the night of the referral incident, and her hand was bruised from him squeezing it.

The social worker found mother difficult to engage with and redirect because mother was unable to regulate her emotions. Mother stated she was done with N.N. and he "could go into the system." Mother initially refused to engage in developing a safety plan, but agreed to meet with a social worker during regular business hours. Mother stated she did not want N.N. in the home, agreed not to contact him pending the investigation, and signed a safety plan, but stated stepfather would not sign it.

During a subsequent in-home visit with mother's attorney present, mother spoke negatively about N.N. and again reiterated that N.N. had anger problems, was

manipulative, disrespectful, defiant, a liar, and used drugs. Mother could not give any examples or evidence of drug use, however, and N.N. had tested negative for drugs. N.N. had failing grades in five classes at school and mother believed he was failing on purpose because he wanted to take lower level classes than the classes mother signed him up for. Mother reported N.N. had approximately 10 law enforcement contacts that had nothing to do with their arguments. She stated he ran away one time and did not want to go to school another time, but she did not provide further detail other than stating contacts occurred because he did not listen to her.

Mother reported she was young when she had N.N. and was a victim of domestic violence by N.N.'s father. She denied N.N. witnessed the domestic violence, though, because he stayed with grandparents when father was around. Mother reported moving a lot and "described a lot of inconsistency" in N.N.'s life. Mother was diagnosed with postpartum depression after N.N.'s birth and she stated the family would benefit from counseling.

Stepfather gave a narrative statement aided by handwritten notes. He displayed the "'weapons'" he confiscated from N.N.: "an airsoft type rifle, airsoft/pellet type handgun, a novelty samurai sword, and three (3) pocket knives." Stepfather had been in N.N.'s life since 2007, approximately, and he described several "abnormal behavior[]" incidents that involved N.N. soiling himself, claiming stepfather broke his leg, stealing money from stepfather's wallet to give to father, and choking his younger half brother. Stepfather stated that N.N. became "'violent'" toward mother for the first time in 2016, which he clarified to mean N.N. was verbally aggressive primarily, postured to intimidate, and used his chest and stomach to bump mother. Stepfather reported that the situation with N.N. worsened six months earlier when the agency became involved with the family due to arguments between N.N. and mother, and N.N. was becoming more defiant. Stepfather stated he was usually the mediator in mother's and N.N.'s arguments, and he had been successful until the referral incident. Stepfather found a nicotine vape

pen in N.N.'s drawer in 2019, but N.N. claimed it belonged to a friend. Stepfather viewed this as confirmation N.N. was using drugs.

Stepfather did not witness the argument between mother and N.N. the night of the referral, but he saw N.N. approach mother and tell her he was "'going to fuck [her] up.'" Mother threw a soda in N.N.'s face in response and he then began hitting her in the back of the head. Stepfather tried to pull N.N. off mother and insinuated N.N. should fight him, a man, rather than a woman. Stepfather then called the police. He stated that the incident was the first time N.N. hit mother or mother hit N.N.

Paternal grandmother reported that N.N. was respectful and adhered to limits set by adults, and she was concerned about mother's and stepfather's characterization of him. Paternal grandmother stated that she and paternal grandfather, now deceased, spent a lot of time with N.N. and that "both sets of grandparents played a vital role in raising [N.N.]," but more recently, mother had limited N.N.'s contact with paternal grandmother, which paternal grandmother believed was due to father's history. However, N.N. had only seen father a few times, paternal grandmother supervised all their interactions, and the last contact was a long time ago. Paternal grandmother had not seen N.N. for more than one year but, three weeks earlier, after maternal grandmother died, mother left N.N. with her for one week.

Paternal grandmother stated she was aware of ongoing conflict in the home and stepfather told her N.N. could not live at home because he and mother were afraid N.N. might hurt his half siblings. Paternal grandmother said N.N. had watched his half siblings many times without incident and he was careful with them. N.N. told paternal grandmother that mother tells him he is her biggest regret and she should have placed him for adoption, and on one occasion, mother made him stand in front of a mirror and repeatedly call himself fat. Paternal grandmother felt "heartbroken" for N.N. and expressed her willingness to ensure his physical and emotional safety, and to allow him to live with her for as long as necessary.

When N.N was interviewed at school, he stated he was not ready to see his mother at the scheduled team meeting and gave the social worker permission to state N.N.'s concerns for him. N.N. described mother as belittling, controlling, and unable to admit when she is wrong. N.N. was unable to communicate with mother because she did not allow him to have a voice or an opinion. Mother put N.N. on an engineering pathway in school, which he disagreed with because he struggled with math. However, mother attributed his struggles in math to his laziness and defiance. N.N. stated that he was doing well enough to keep advancing despite his struggles and he was not at risk of being dropped from the engineering pathway. Mother constantly accused him of using drugs and had him drug tested at school. His drug tests were negative. N.N. wanted to participate in extracurricular activities, but mother would not let him.

At the child family team meeting held on October 17, 2019, mother and stepfather expressed that N.N. should live somewhere besides their home. Paternal grandmother expressed willingness to file for legal guardianship of N.N. and mother agreed N.N. could continue residing with paternal grandmother. Several days later, mother expressed concern with comments paternal grandmother made in the legal guardianship documents, and mother filled out a form precluding the social worker from receiving information from or disclosing information to N.N.'s high school. After paternal grandmother filed for legal guardianship of N.N., mother filed an opposition.

Mother reported Blackfoot lineage through her father's side of the family. Paternal grandmother provided information regarding Native American ancestry on father's side of the family.

There were no visits between mother and N.N., as N.N. refused to see mother.

**Addendum to Jurisdiction and Disposition Report**

On January 30, 2020, the agency filed an addendum reflecting that mother stated she was not willing to accept a finding that she abused N.N. and if the petition was sustained, she was not willing to waive her rights and go through the legal guardianship

process.  The addendum also reflected that N.N. had excellent attendance at school and a 2.89 grade point average.

**Second Amended Petition**

On March 2, 2020, the agency filed a second amended petition adding a jurisdictional allegation against mother under section 300, subdivision (g) (no provision for support).

**Second and Third Addenda to Jurisdiction and Disposition Report**

On March 9, 2020, the agency filed a second addendum to the jurisdiction and disposition report.  The addendum detailed mother's multiple email communications with the agency and request for various documents.  Mother expressed intent to enroll N.N. in an out-of-state military academy, concerns with paternal grandmother, and desire for reunification services.  A social worker confirmed with N.N.'s high school that mother had online access to N.N.'s school information.

N.N. stated he did not want to have visitation with mother, did not want mother to have any say or control over his life anymore, and was the happiest and most stable he had been in a long time.  N.N. was working toward getting his driver's license.  He wanted to exercise his right to privacy, and he declined to authorize mother's receipt of his medical and dental visit summaries.

On March 12, 2020, the agency filed a third addendum to the jurisdiction and disposition report.  The addendum documented that mother contacted the agency regarding a hearing notice, and N.N.'s school account and grades.  The agency also received a parentage inquiry–juvenile form (Judicial Council Forms, form JV-500), indicating A.N. is N.N.'s father, and the agency confirmed with father's parole agent that there were no active restraining orders against father and no restrictions preventing him from visiting his biological children.

**Jurisdiction and Disposition Hearing**

After numerous continuances and an unsuccessful attempt at settling the matter, a combined and contested jurisdiction and disposition hearing commenced on June 12, 2020. Mother, stepfather, N.N., a social worker, and a witness to the altercation between mother and N.N. testified during the hearing.

On July 14, 2020, the juvenile court issued its ruling. The court stated that it gave significant weight to the social worker's testimony, found mother to be evasive, found no credible evidence that N.N. was using drugs despite mother's repeated claims to the contrary, and found many of mother's statements during her testimony "fully contradicted" by a "disturbing" cell phone recording N.N. made of an argument between himself and mother that was admitted for impeachment. The court sustained the second amended petition allegations against mother and found N.N. was as described by section 300, subdivisions (a), (b)(1), and (g). The court found by clear and convincing evidence that there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of N.N. if he was returned home, and there were no reasonable means by which his physical health could be protected without removing him from mother's physical custody. The court found no progress by mother toward alleviating or mitigating the causes necessitating N.N.'s placement in out-of-home care, but found it unnecessary to limit mother's right to make educational decisions for N.N. The court ordered N.N. removed from the custody of mother under section 361, subdivision (c)(1), and ordered supervised visitation and reunification services for mother.

The court set an ICWA review hearing.

**Interim Review Report**

On August 4, 2020, the agency filed an interim review report, providing updates on ICWA, service compliance for mother, and educational decisions by mother. The agency recommended the court find ICWA does not apply.

10.

**ICWA Review Hearing**

At the ICWA review hearing held on August 11, 2020, the agency requested that the court find ICWA does not apply and, based on N.N.'s counsel's request that the court limit mother's right to make educational decisions, that the right to make those decisions be vested with paternal grandmother. Mother's counsel objected to the limitation of mother's educational rights on the ground that it was not based on new information and there were no changed circumstances since the court's prior order finding it was not necessary to limit mother's rights.

The court found that ICWA does not apply. It also concluded that it was in N.N.'s best interest to limit mother's right to make educational decisions for him and appointed paternal grandmother to make those decisions.

Mother thereafter filed a timely notice of appeal.

**Termination of Dependency Jurisdiction**

On May 7, 2021, after N.N. turned 18 years old, the juvenile court terminated dependency jurisdiction and mother's services.

## DISCUSSION

### I. Mootness

"In general, it is a court's duty to decide ""'actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'"" [Citation.] '[T]he critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error.' [Citation.] A court ordinarily will dismiss an appeal when it cannot grant effective relief, but may instead 'exercise its inherent discretion to resolve an issue when there remain "material questions for the court's determination" [citation], where a "pending case poses an issue of broad public interest that is likely to recur"

[citation], or where "there is a likelihood of recurrence of the controversy between the same parties or others."'" (*In re David B.* (2017) 12 Cal.App.5th 633, 644.)

"As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot. [Citation.] However, dismissal for mootness in such circumstances is not automatic, but 'must be decided on a case-by-case basis.'" (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488; accord, *In re Rashad D.* (2021) 63 Cal.App.5th 156, 163.)

"On rare occasions, appellate courts will proceed to decide moot cases presenting 'an issue of broad public interest that is likely to recur.'" (*In re David. B.*, *supra*, 12 Cal.App.5th at p. 653.) "[T]here are differences in the phrasing used by courts to describe this and a related exception to mootness, with varying degrees of emphasis on the importance of the issue presented and the likelihood that it will recur. Some decisions state an appellate court has discretion to resolve 'an issue *of broad public interest* that is *likely* to recur.' [Citations.] Others state an appellate court may decide 'otherwise moot cases presenting *important* issues that are *capable* of repetition yet tend to evade review.' [Citations.] Another version of the rule may be found in decisions focusing primarily on the importance of the issue presented [citation], and still others referring only to the likelihood the issue will recur [citation]. Finally, as noted, some decisions state that, apart from the mootness exception for issues of public importance, there is what appears to be a narrower exception where '"there is a likelihood of recurrence of the controversy between the same parties *or others*"' [citations], while other decisions limit this exception to a scenario where there is a likelihood of recurrence of the controversy between *the same parties* [citations]." (*Id.* at pp. 653–654, fn. omitted.) "Despite the nuanced variation in these articulations of when an appellate court may proceed to decide an otherwise moot appeal, the common thread running through the cases is that doing so is appropriate only if a ruling on the merits will affect future proceedings between the parties or will have some precedential consequence in future litigation generally." (*Id.* at

p. 654; see *In re Caden C.* (2021) 11 Cal.5th 614, 629, fn. 3 [exercising "discretion to retain [moot parental-benefit exception] case and decide it as one presenting issues of public importance, capable of repetition, yet tending to evade review"].)

## II. Analysis

Mother appeals from the juvenile court's jurisdiction and disposition orders sustaining the allegation that N.N. "has been left without any provision for support" under section 300, subdivision (g); limiting her right to make educational decisions; and finding ICWA does not apply. N.N. is 18 years old and mother acknowledges that the juvenile court terminated dependency jurisdiction.[4] However, mother argues that her claims are not moot because the section 300, subdivision (g), finding may result in her inclusion in the Child Abuse Central Index (CACI) under the Child Abuse and Neglect Reporting Act (Pen. Code, § 11164 et seq.), which poses a threat of future harm to her employment prospects, and she cannot challenge her inclusion if a finding of neglect is affirmed. Further, citing section 361.5, subdivision (b)(10), she argues that the finding could prejudice her with respect to a future dependency proceeding concerning her other children, although none is pending or anticipated.

With respect to the limitation of her right to make educational decisions, mother argues that the juvenile court applied the incorrect legal standard and given the dearth of published decisions concerning educational decision rights, clarification of the legal standard is an important legal issue that is likely to recur. Finally, as to the ICWA finding, mother argues that the agency will continue to fail in fulfilling its duty of inquiry if we do not correct it, and there are no published decisions holding that the agency must document further inquiry efforts and submit that documentation to the court.

---

[4] On our own motion, we ordered the record augmented to include the order terminating dependency jurisdiction filed on May 7, 2021.

13.

As explained below, we are unpersuaded by these arguments and conclude that mother's appeal presents issues that are now moot.

## A. Alleged Prejudice from Section 300, Subdivision (g), Finding

"The court asserts jurisdiction with respect to a child when one of the statutory prerequisites listed in section 300 has been demonstrated" (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491), and "[t]he general rule is that 'the juvenile court's exercise of jurisdiction over a child will be upheld if substantial evidence supports any one of the statutory bases for jurisdiction enumerated in the petition'" (*In re M.R.* (2017) 7 Cal.App.5th 886, 896). However, it may be appropriate to reach the merits where "(1) the jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal; (2) the findings could be prejudicial to the appellant or could impact the current or any future dependency proceedings; and (3) the finding could have consequences for the appellant beyond jurisdiction." (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1150; accord, *In re Rashad D.*, *supra*, 63 Cal.App.5th at p. 164; *In re M.R.*, *supra*, at p. 896.)

Here, in addition to the section 300, subdivision (g), finding, the juvenile court sustained the allegations that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian" (*id.*, subd. (a)), and that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child" (*id.*, subd. (b)(1)). Mother does not challenge these findings on appeal and fails to explain how a determination in her favor on the court's section 300, subdivision (g), finding would be of any ameliorative benefit to her given the section 300, subdivision (a) and (b)(1), findings.

Regarding potential future stigmatization due to inclusion on CACI, Penal Code section 11170, subdivision (a)(1), provides, "The Department of Justice shall maintain an

14.

index of all reports of child abuse and severe neglect submitted pursuant to [Penal Code] Section 11169.  The index shall be continually updated by the department and shall not contain any reports that are determined to be not substantiated.…"  "An agency specified in [Penal Code] Section 11165.9 shall forward to the Department of Justice a report in writing of every case it investigates of known or suspected child abuse or severe neglect that is determined to be substantiated, other than cases coming within subdivision (b) of [Penal Code] Section 11165.2.…"  (*Id.*, § 11169, subd. (a).)

"'[C]hild abuse or neglect' includes physical injury or death inflicted by other than accidental means upon a child by another person, sexual abuse as defined in [Penal Code] Section 11165.1, neglect as defined in [Penal Code] Section 11165.2, the willful harming or injuring of a child or the endangering of the person or health of a child, as defined in [Penal Code] Section 11165.3, and unlawful corporal punishment or injury as defined in [Penal Code] Section 11165.4.…"  (Pen. Code, § 11165.6.)  The speculative nature of mother's claim regarding CACI inclusion aside, given the relevant definition of child abuse or neglect and the court's unchallenged findings under section 300, subdivisions (a) and (b)(1), mother fails to show how reversal of the finding under section 300, subdivision (g), would have any effect on her present or future inclusion in CACI.[5]

Regarding the possibility of harm in a future dependency proceeding pursuant to section 361.5, subdivision (b)(10), we note that mother was not subject to any prior dependency proceedings and the prior referrals found unfounded or inconclusive involved N.N.  When social workers interviewed N.N.'s two younger half siblings during

---

[5]    As mother points out, the California Supreme Court recently granted review in an unpublished decision to consider whether appeal of a jurisdictional finding is moot where the parent claims stigmatization and an inability to challenge current or future placement on CACI. (*In re. D.P.* (Feb. 10, 2021, B301135) [nonpub. opn.] [2021 Cal.App. Unpub. Lexis 860, review granted May 26, 2021, S267429].)  That case, however, involves a single jurisdictional finding under section 300, subdivision (b)(1).  (*In re D.P.*, *supra*, at pp. *5–7.[2021 Cal.App. Unpub. Lexis 860 at pp. *5–7].)

the course of investigating this matter, they observed that both "appeared to have [their] basic needs met and did not present with any visible indicators of abuse or neglect," and both "appeared comfortable in their home and engaged in appropriate interactions with [stepfather]," who was present. Further, N.N. did not think his half siblings were in any danger left in the care of mother and stepfather because they, as the children of stepfather and mother, were treated differently than he was.

The family reunification services bypass provision cited by mother in support of her future harm argument states, in relevant part, "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence … [¶] … [¶] [t]hat the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a) and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian." (§ 361.5, subd. (b)(10).) Application of this subdivision in a future proceeding "contemplates a two-prong inquiry: (1) whether the parent previously failed to reunify with the child's sibling or half sibling; and (2) whether the parent 'subsequently made a reasonable effort to treat the problems that led to [the] removal of the sibling or half sibling.'" (*In re B.H.* (2016) 243 Cal.App.4th 729, 736.)

To the extent that mother may find herself subject to a future dependency proceeding involving N.N.'s two younger half siblings, which is speculative, she does not explain how consideration of her challenge to the juvenile court's jurisdictional finding under section 300, subdivision (g), is relevant to a section 361.5, subdivision (b)(10), finding. As previously stated, the jurisdictional allegations under section 300, subdivisions (a) and (b)(1), are unchallenged, and the juvenile court in this proceeding

16.

did not terminate mother's services for failure to reunify with N.N., which is a requirement to application of section 361.5, subdivision (b)(10).

**B.      Claim Issues Presented are of Legal Importance and Likely to Recur**

Finally, mother urges that we should exercise our discretion to reach all three of her claims because they raise issues of legal importance that are likely to recur. We disagree.

With respect to the jurisdictional finding under section 300, subdivision (g), we cannot grant mother effective relief on this claim should she prevail on the merits, and, for the reasons previously set forth, we discern no legal issues of a magnitude that necessitate consideration.

As to the limitation on mother's right to make educational decisions, mother contends that the juvenile court applied the wrong legal standard. "When a child is adjudicated dependent, the dependency court has broad discretion to make any reasonable orders for the care and support of the child, specifically including orders limiting the right of the parents to make educational decisions for the child." (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1087, fn. 12.) An "order limiting parents' educational rights [is reviewed] under an abuse of discretion standard (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319), bearing in mind '[t]he focus of dependency proceedings is on the child, not the parent' (*In re Hadley B.* (2007) 148 Cal.App.4th 1041, 1048,)." (*In re R.W.* (2009) 172 Cal.App.4th 1268, 1277.) Furthermore, "'[w]e uphold judgments if they are correct for any reason, "regardless of the correctness of the grounds upon which the court reached its conclusion." [Citation.] "It is judicial action and not judicial reasoning which is the subject of review ...."' [Citation.] We will not reverse for error unless it appears reasonably probable that, absent the error, the appellant would have obtained a more favorable result." (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 876.)

We are unpersuaded that these legal standards require clarification and the extent to which the juvenile court may have misspoken is not determinative of the issue.

17.

Moreover, a finding in mother's favor on the merits would be of no consequence in this instance.

Finally, mother urges us to reach her ICWA claim, which asserts the agency failed to fulfill its duty to conduct an adequate further inquiry and, as a result, the court's ICWA finding is not supported by substantial evidence. Mother argues that if we do not reach the claim, the agency will continue to err in this regard and counsel was not able to locate any published decisions squarely on point.

We agree with the agency both that mother's claims are fact specific (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 215 [declining to decide moot issues that are "essentially factual in nature" and "require resolution on a case-by-case basis"]), and that ICWA claims are frequently litigated on appeal (see, e.g., *In re D.F.* (2020) 55 Cal.App.5th 558, 568–572 [discussing ICWA requirements]). As already noted, N.N. is 18 years old and the juvenile court terminated dependency jurisdiction. (See *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 783 ["For purposes of ICWA, an 'Indian child' is an unmarried individual under age 18 who is either a member of a federally recognized Indian tribe or is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe."]; *In re Melissa R.* (2009) 177 Cal.App.4th 24, 33–34 [the agency failed to comply with ICWA notice requirements, but issue moot because reviewing court could not provide meaningful relief where subject of dependency proceeding was 20 years old and no longer "an 'Indian Child'" under ICWA]; see also § 224.1, subd. (b) ["As used in connection with an Indian child custody proceeding, the term 'Indian child' also means an unmarried person who is 18 years of age or over, but under 21 years of age, who is a member of an Indian tribe or eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe, *and who is under the jurisdiction of the dependency court*, unless that person or their attorney elects not to be considered an Indian child for purposes of the Indian child custody proceeding." (Italics added.)].)

Under these circumstances, as with her other claims, we cannot grant mother effective relief and the nature of her ICWA claim does not warrant deviation from the general rule that we do not reach moot issues.

## DISPOSITION

Mother's appeal is dismissed as moot.


MEEHAN, Acting P.J.

WE CONCUR:


SNAUFFER, J.


DeSANTOS, J.